**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**WEST PALM BEACH DIVISION**
**www.flsb.uscourts.gov**

| | |
|---|---|
| In re<br><br>VICOR TECHNOLOGIES, INC.,<br><br>Alleged Debtor. | Case No. 12-39329-BKC-EPK<br><br>Involuntary Chapter 7 |

## DECLARATION OF DAVID H. FATER

David H. Fater states:

1.  My name is David H. Fater.  I am over 18 years of age and fully competent to make this declaration, and I have personal knowledge of the facts set forth herein.

2.  I am a petitioning creditor of the Alleged Debtor, Vicor Technologies, Inc. ("Vicor") holding a claim against Vicor in the amount of at least $171,988.92, for unpaid compensation, expenses and loans, which is not contingent as to liability, and is not the subject of a bona fide dispute as to liability or amount.  I am also the former chief executive officer of Vicor, and held that position from June, 2002 through December, 2011.

3.  I have personal knowledge of the facts and circumstances stated in the *Petitioning Creditors' Emergency Motion for (i) Appointment of Interim Trustee and Waiver of Bond Requirement or, in the Alternative, (ii) Restriction of Alleged Debtor's Rights to Use and Dispose of Certain Intellectual Property Under 11 U.S.C. § 303(f)* (the "Motion"), and make this declaration in support of the Motion.

### Vicor Background

4.  Vicor is a medical diagnostics company formed in 2000 and headquartered in Boca Raton, Florida, focused on developing and commercializing medical diagnostic products using its patented PD2i® algorithm and software, which enables physicians to accurately risk stratify a specific target population to predict future pathological events, such as autonomic

nervous system dysfunction, cardiac mortality (either from arrhythmic death or congestive heart failure) and imminent death from trauma.   In 2011, Vicor was commercializing two diagnostic products which employ software using the PD2i® algorithm: the PD2i Analyzer™ (sometimes referred to as the PD2i Cardiac Analyzer™) and the PD2i-VS™ (Vital Sign), and held three U.S. registered trademarks for these products.  The PD2i® algorithm patents and related intellectual property are actually owned by Vicor's two wholly-owned subsidiaries, Nonlinear Medicine, Inc. ("NMI") and Stasys Technologies, Inc. ("STI").

5.      The PD2i Analyzer™ received section 510(k) marketing clearance from the U.S. Food and Drug Administration ("FDA") in December, 2008, and sales of this product commenced in January, 2010.  By the end of 2010, Vicor had contracted 27 independent sales representatives in over 30 states and the District of Columbia, and had begun hiring in-house sales personnel in selected states to supplement its outside sales force.

6.      The principal customers for Vicor's PD2i Analyzer™ were physicians specializing in family practice and internal medicine, as well as endocrinologists. In addition to its domestic marketing strategy, Vicor marketed its products internationally through foreign distribution partners, and in fact had distribution agreements for the People's Republic of China, Australia, Israel and Palestine.

7.      From 2003 through 2011, Vicor raised over $30 million in capital and achieved the following significant milestones:

- Obtained domestic and international patents for the PD2i® algorithm;
- Obtained two FDA section 510-K marketing clearances in 2008 and 2011;
- Developed an innovative and proprietary internet delivery-based system for analysis;
- Commenced commercial sales to physicians in the United States;
- Developed a second generation ECG and laptop collection device with a major equipment manufacturer;
- Secured an exclusive distribution agreement with the People's Republic of China pending completion of Chinese regulatory review and approval.

- Secured an exclusive distribution agreement for Israel and Palestine pending completion of Israeli Health Authority review, though the technology is in use by the Israeli Defense Force and the prestigious Wingate Institute;
- Conducted numerous clinical trials at major universities for various modalities, including concussion, anesthesia, ER triage and others;
- Gained recognition of the PD2i Analyzer for use in a wide range of modalities and disease states with over 50 peer-reviewed published manuscripts and poster presentations at the American Heart Association, American College of Cardiology and Society for Critical Care Medicine.
- Entered into a development and licensing agreement with Zoll Medical Corp., a leading medical device manufacturer, which was terminated after the departure of the former management team.

8.      Unfortunately, however, Vicor's start-up developmental expenses were very high and depleted the company's working capital by 2011.  For example, Vicor's research and development expenses for 2009-2010 alone totaled approximately $1.6 million. These expenses included laboratory supplies, hardware costs, programming and software costs, sponsored research activities and salary and fringe benefit costs for employees who were engaged in research, development, clinical and regulatory activities, as well as clinical trial costs, clinical and regulatory consulting, and manufacturing costs.

9.      In 2010 and 2011, a series of financings were planned that could have enabled Vicor's success but an internal dispute between the shareholders, board of directors and management resulted in a shareholder derivative action filed against Vicor and its directors.  This lawsuit was ultimately settled but, in the opinion of former management who are among the petitioners, it prevented consummation of the financing.  As a result, Vicor ran out of cash in or around May, 2011, and most of Vicor management team, including four of the petitioning creditors, resigned in December 2011, out of frustration with the Board and the circumstances that gave rise to the shareholder derivative suit, after working from June, 2011 through December, 2011 without pay.

10.      In March, 2011, Vicor had 16 employees and engaged the services of several outside consultants. Thirteen of these employees were engaged in executive, administrative,

business development, sales, marketing and intellectual property functions, and three were engaged in research, development and clinical/regulatory activities.  Upon information and belief, Vicor is now being operated solely by its interim CEO and only remaining officer, James Skinner, and, upon information and belief, its only business activity is to service those few physicians who are still using the company's diagnostic products rather than marketing existing products and developing new products.

11.    I believe that Vicor has no working capital or financing prospects, and that its only assets of significant value are its patented and trademarked intellectual property now being wasted rather than developed and marketed.  Vicor was deactivated by the Florida Secretary of State in September, 2011, and, upon information and belief, its vendors have not been paid in 18 months.  Vicor is not current in any of its required SEC filings and has failed to formally communicate with its shareholders.  Upon information and belief, Vicor has over $13 million in undisputed liabilities, including two classes of convertible notes, all of which are significantly past due.

### Skinner's Plan to Strip Vicor of its Intellectual Property

12.    I have good reason to believe that James Skinner is attempting to transfer Vicor's valuable patents and intellectual property out of Vicor and into a new company while leaving creditors unpaid.  On November 19, 2011, an e-mail was sent by or on behalf of Skinner to a select group of unspecified recipients, some of whom presumably were selected Vicor stockholders and creditors, outlining the terms of this plan.  This e-mail, a copy of which is attached to the Motion as Exhibit C, clearly reflects Skinner's intent to strip Vicor of its valuable intellectual property, by transferring it to a "Newco" entity in which his selected group of Vicor stockholders will receive shares while others are left out based upon his unilateral determination of "cautious (i.e., tortious) interference," to the severe detriment of Vicor creditors.

13.     I believe that if this valuable intellectual property is transferred out of Vicor and lost to the estate, creditors will suffer irreparable harm since this property reflects Vicor's only real value.

14.     Each of the facts stated in the Motion is true and accurate, and each of the exhibits attached to the Motion is a true and correct copy of the original referenced document.  I believe that, for the reasons stated in the Motion, the immediate appointment of an interim trustee is necessary to avoid irreparable harm to the estate and Vicor creditors.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on December 10, 2012.

David H. Fater