**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
WASHINGTON, D.C. 20549

## FORM 10-Q

(Mark One)

☑    **QUARTERLY REPORT UNDER SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF**
**1934**

**For the Quarterly Period Ended September 30, 2011**

**OR**

☐    **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES   EXCHANGE**
**ACT OF 1934**

For the transition period from                    to

**Commission File Number: 0-51475**

# VICOR TECHNOLOGIES, INC.

(Exact name of registrant as specified in its charter)

| **Delaware** | **20-2903491** |
|---|---|
| (State or other jurisdiction of | (I.R.S. Employer |
| incorporation or organization) | Identification No.) |

| **2200 NW Corporate Boulevard, Suite 401, Boca Raton, Florida** | **33431** |
|---|---|
| (Address of principal executive office) | (Zip Code) |

**(561) 995-7313**
(Registrant's telephone number, including area code)

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☑   No ☐

Indicate by check mark whether the registrant has electronically submitted and posted on its corporate Web site, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the Registrant was required to submit and post such files). Yes ☐   No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or a smaller reporting company. See the definitions of "large accelerated filer," "accelerated filer" and "smaller reporting company" in Rule 12b-2 of the Exchange Act. (Check one):

Large accelerated filer ☐    Accelerated filer ☐         Non-accelerated filer ☐         Smaller reporting company ☑
                                                 (Do not check if a smaller reporting
                                                                 company)

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act). Yes ☐ No ☑

**APPLICABLE ONLY TO CORPORATE ISSUERS**

As of September 30, 2011, there were 56,853,964 shares of the Registrant's Common Stock, $.0001 par value, outstanding.

Transitional Small Business Disclosure Form (Check one): Yes ☐    No ☑

**VICOR TECHNOLOGIES, INC.**
**Quarterly Report on Form 10-Q for the Period Ended September 30, 2011**

— TABLE OF CONTENTS —

|  | Page |
|---|---|
| **PART I — Financial Information** | |
| Item 1. Condensed Consolidated Financial Statements: | |
| Condensed Consolidated Balance Sheets as of December 31, 2010 and September 30, 2011 (unaudited) | 3 |
| Condensed Consolidated Statements of Operations for the three and nine months ended September 30, 2010 and 2011 and the period from August 4, 2000 (inception) through September 30, 2011 (unaudited) | 4 |
| Condensed Consolidated Statement of Changes in Net Capital Deficiency for the nine months ended September 30, 2011 (unaudited) | 6 |
| Condensed Consolidated Statements of Cash Flows for the nine months ended September 30, 2010 and September 30, 2011 and the period from August 4, 2000 (inception) through September 30, 2011 (unaudited) | 7 |
| Notes to Condensed Consolidated Financial Statements (unaudited) | 9 |
| Item 2. Management's Discussion and Analysis of Financial Condition and Results of Operations | 16 |
| Item 3. Quantitative and Qualitative Disclosures about Market Risk | 22 |
| Item 4. Controls and Procedures | 22 |
| **PART II — Other Information** | |
| Item 1. Legal Proceedings | 22 |
| Item 2. Unregistered Sales of Equity Securities and Use of Proceeds | 22 |
| Item 3. Defaults Upon Senior Securities | 22 |
| Item 4. Removed and reserved | 23 |
| Item 5. Other Information | 23 |
| Item 6. Exhibits | 23 |
| **Signatures** | |

2

**Vicor Technologies, Inc.**
**(A Development Stage Company)**
**Condensed Consolidated Balance Sheets**
**December 31, 2010 and September 30, 2011**

| | December 31, 2010 | September 30, 2011 (unaudited) |
|---|---|---|
| **ASSETS** | | |
| Current assets: | | |
| Cash | $ 1,119,000 | $ 3,000 |
| Accounts receivable | 58,000 | 112,000 |
| Inventory | 58,000 | 5,000 |
| Prepaid expenses | 411,000 | 233,000 |
| Total current assets | 1,646,000 | 353,000 |
| | | |
| Property and equipment: | | |
| Equipment | 213,000 | 244,000 |
| Furniture and fixtures | 24,000 | 24,000 |
| Less accumulated depreciation | (82,000) | (150,000) |
| Net property and equipment | 155,000 | 118,000 |
| | | |
| Other assets: | | |
| Deposits | 18,000 | 17,000 |
| Deferred financing costs | 8,076,000 | 5,000 |
| Intellectual property, net of accumulated amortization of $260,000 and $296,000 at December 31, 2010 and September 30, 2011, respectively | 192,000 | 212,000 |
| | $ 10,087,000 | $ 705,000 |
| | | |
| **LIABILITIES AND NET CAPITAL DEFICIENCY** | | |
| | | |
| Current liabilities: | | |
| Accounts payable and accrued expenses | $ 1,166,000 | $ 3,217,000 |
| Current debt | 360,000 | 8,548,000 |
| Due to related parties | 88,000 | 182,000 |
| Total current liabilities | 1,614,000 | 11,947,000 |
| | | |
| Long-term liabilities: | | |
| Long-term debt | 8,277,000 | - |
| Accrued dividends | 932,000 | 1,258,000 |
| Derivative financial instruments payable in shares of common stock | 7,692,000 | 390,000 |
| Total long-term liabilities | 16,901,000 | 1,648,000 |
| | | |
| Commitments and contingencies | | |
| | | |
| Net capital deficiency: | | |
| Preferred stock, $.0001 par value; 25,000,000 shares authorized: | | |
| Series B Voting Junior Convertible Cumulative, 5,185,101 shares issued and outstanding at December 31, 2010 and September 30, 2011; preference in liquidation of $5,795,000 and $6,121,000 at December 31, 2010 and September 30, 2011, respectively | - | - |
| Common stock, $.0001 par value; 150,000,000 shares authorized; 46,799,324 and 56,853,964 shares issued and outstanding at December 31, 2010 and September 30, 2011, respectively | 5,000 | 6,000 |
| Additional paid-in capital | 51,275,000 | 53,298,000 |
| Deficit accumulated during the development stage | (59,708,000) | (66,194,000) |
| Net capital deficiency | (8,428,000) | (12,890,000) |

$ 10,087,000 $ 705,000

See accompanying notes to condensed consolidated financial statements.

3

Vicor Technologies, Inc.
(A Development Stage Company)
Condensed Consolidated Statements of Operations
For the three months ended September 30, 2010 and 2011
(Unaudited)

|  | Three months ended September 30, 2010 | Three months ended September 30, 2011 |
|---|---|---|
| Revenue: |  |  |
| Sales | $      14,000 | $      48,000 |
| Leases | - | 6,000 |
|  | 14,000 | 54,000 |
| Cost of revenue | 1,000 | 21,000 |
| Gross profit | 13,000 | 33,000 |
| Operating expenses: |  |  |
| Research and development | 161,000 | 167,000 |
| Selling, general and administrative | 1,353,000 | 1,837,000 |
| Interest | 458,000 | 5,301,000 |
| Total operating expenses | 1,972,000 | 7,305,000 |
|  | (1,959,000) | (7,272,000) |
| Gain on derivative financial instruments: |  |  |
| Realized | 7,000 | 15,000 |
| Unrealized | 1,135,000 | 888,000 |
|  | 1,142,000 | 903,000 |
| Net loss | (817,000) | (6,369,000) |
| Dividends for the benefit of preferred stockholders: |  |  |
| Payable on Series B preferred stock | (105,000) | (105,000) |
| Amortization of derivative discount on Series B preferred stock | (256,000) | (249,000) |
| Total dividends for the benefit of preferred stockholders | (361,000) | (354,000) |
| Net loss applicable to common stock | $(1,178,000) | $(6,723,000) |
| Net loss per common share - basic and diluted | $       (0.03) | $       (0.13) |
| Weighted average number of shares of common stock outstanding | 45,696,110 | 53,727,259 |

See accompanying notes to condensed consolidated financial statements.

4

Vicor Technologies, Inc.
(A Development Stage Company)
Condensed Consolidated Statements of Operations
For the nine months ended September 30, 2010 and 2011 and
For the period from August 4, 2000 (inception) to September 30, 2011
(Unaudited)

| | Nine months ended September 30, 2010 | Nine months ended September 30, 2011 | Period from August 4, 2000 (Inception) to September 30, 2011 |
|---|---|---|---|
| Revenue: | | | |
| Sales | $ 122,000 | $ 336,000 | $ 521,000 |
| Leases | - | 25,000 | 29,000 |
| Grants and other | - | - | 844,000 |
| | 122,000 | 361,000 | 1,394,000 |
| Cost of revenue | 88,000 | 177,000 | 308,000 |
| Gross profit | 34,000 | 184,000 | 1,086,000 |
| Operating expenses: | | | |
| Research and development | 511,000 | 452,000 | 16,117,000 |
| Selling, general and administrative | 4,210,000 | 4,962,000 | 40,000,000 |
| Interest | 1,461,000 | 7,504,000 | 17,905,000 |
| Loss from extinguishment of debt | - | - | 1,266,000 |
| Total operating expenses | 6,182,000 | 12,918,000 | 75,288,000 |
| | (6,148,000) | (12,734,000) | (74,202,000) |
| Gain on derivative financial instruments: | | | |
| Realized | 318,000 | 77,000 | 1,478,000 |
| Unrealized | 1,161,000 | 7,244,000 | 11,991,000 |
| | 1,479,000 | 7,321,000 | 13,469,000 |
| Net loss | (4,669,000) | (5,413,000) | (60,733,000) |
| Cumulative effect of change in accounting principle | - | - | 480,000 |
| Dividends for the benefit of preferred stockholders: | | | |
| Payable on Series A and Series B preferred stock | (345,000) | (326,000) | (1,675,000) |
| Amortization of derivative discount on Series B preferred stock | (755,000) | (747,000) | (2,730,000) |
| Value of warrants issued in connection with sales of Series B preferred stock | - | - | (1,536,000) |
| Total dividends for the benefit of preferred stockholders | (1,100,000) | (1,073,000) | (5,941,000) |
| Net loss applicable to common stock | $ (5,769,000) | $ (6,486,000) | $ (66,194,000) |
| Net loss per common share - basic and diluted | $ (0.13) | $ (0.13) | |
| Weighted average number of shares of common stock outstanding | 44,338,061 | 50,357,253 | |

See accompanying notes to condensed consolidated financial statements.

5

**Vicor Technologies, Inc.**
**(A Development Stage Company)**
**Condensed Consolidated Statement of Changes in Net Capital Deficiency**
**For the nine months ended September 30, 2011**
**(Unaudited)**

| | Common Stock | | Preferred Stock - Class B | | Additional Paid-In Capital | Accumulated Deficit | Total |
|---|---|---|---|---|---|---|---|
| | Shares | Amount | Shares | Amount | | | |
| Balance at December 31, 2010 | 46,799,324 | $ 5,000 | 5,185,101 | $ - | $51,275,000 | $ (59,708,000) | $ (8,428,000) |
| Accrued dividends on preferred stock | - | - | - | - | - | (326,000) | (326,000) |
| Issuance of stock for interest payments | 3,640 | - | - | - | 2,000 | - | 2,000 |
| Issuance of stock for consulting and fees | 947,267 | - | - | - | 204,000 | - | 204,000 |
| Issuance of stock for services | 781,305 | - | - | - | 330,000 | - | 330,000 |
| Issuance of stock for conversion of debt | 6,609,587 | 1,000 | - | - | 595,000 | - | 596,000 |
| Issuance of stock with equity line of credit draws | 1,550,591 | - | - | - | 90,000 | - | 90,000 |
| Issuance of warrants for consulting | - | - | - | - | 14,000 | - | 14,000 |
| Issuance of warrants with debt | - | - | - | - | 15,000 | - | 15,000 |
| Exercise of warrants | 162,250 | - | - | - | 40,000 | - | 40,000 |
| Issuance of stock options | - | - | - | - | 6,000 | - | 6,000 |
| Financing costs for equity line of credit | - | - | - | - | (20,000) | - | (20,000) |
| Amortization of discounts related to derivative financial instruments | - | - | - | - | 747,000 | (747,000) | - |
| Net loss | | | | | | (5,413,000) | (5,413,000) |
| Balance at September 30, 2011 | 56,853,964 | $ 6,000 | 5,185,101 | $ - | $53,298,000 | $ (66,194,000) | $(12,890,000) |

See accompanying notes to condensed consolidated financial statements.

6

**Vicor Technologies, Inc.**
**(A Development Stage Company)**
**Condensed Consolidated Statements of Cash Flows**
**For the nine months ended September 30, 2010 and 2011 and**
**For the period from August 4, 2000 (inception) to September 30, 2011**
**(Unaudited)**

| | Nine months ended September 30, 2010 | Nine months ended September 30, 2011 | Period from August 4, 2000 (Inception) to September 30, 2011 |
|---|---|---|---|
| Cash flows from operating activities: | | | |
| Net loss | $ (4,669,000) | $ (5,413,000) | $ (60,733,000) |
| Adjustments to reconcile net loss to net cash used in operating activities: | | | |
| Depreciation and amortization | 53,000 | 104,000 | 508,000 |
| Noncash interest imputed upon conversion of debt to equity | - | - | 5,620,000 |
| Noncash interest and amortization of deferred financing costs | 1,130,000 | 8,094,000 | 12,180,000 |
| Gain on derivative financial instruments | (1,479,000) | (7,321,000) | (13,469,000) |
| Loss from sale of assets | - | - | 48,000 |
| Securities issued for services | 230,000 | 169,000 | 2,113,000 |
| Beneficial conversion feature of notes payable | 68,000 | - | 303,000 |
| Contributed research and development services | - | - | 95,000 |
| Merger-related costs | - | - | 523,000 |
| Shares in lieu of interest payments | 5,000 | 2,000 | 389,000 |
| Equity-based compensation | 495,000 | 325,000 | 19,674,000 |
| Changes in assets and liabilities: | | | |
| Accounts receivable | (43,000) | (54,000) | (112,000) |
| Inventory | (126,000) | 54,000 | (4,000) |
| Prepaid expenses and other assets | (667,000) | 220,000 | (1,678,000) |
| Accounts payable and accrued expenses | 1,233,000 | 2,238,000 | 5,139,000 |
| Accrued royalties due to related party | - | 62,000 | 62,000 |
| Net cash used in operating activities | (3,770,000) | (1,520,000) | (29,342,000) |
| Cash flows from investing activities: | | | |
| Purchase of intellectual property | - | (56,000) | (293,000) |
| Net proceeds from sale of equipment | - | - | 59,000 |
| Purchase of property and equipment | (110,000) | (32,000) | (387,000) |
| Net cash used in investing activities | (110,000) | (88,000) | (621,000) |
| Cash flows from financing activities: | | | |
| Due to related parties | - | 32,000 | 132,000 |
| Proceeds from bank loans | - | - | 300,000 |
| Proceeds from sale of preferred stock | - | - | 2,915,000 |
| Proceeds from sale of common stock | - | - | 11,268,000 |
| Proceeds from exercise of warrants | - | 40,000 | 40,000 |
| Repayment of notes | - | - | (1,005,000) |
| Proceeds from bridge loan | - | - | 300,000 |
| Proceeds from sale of notes | 3,667,000 | 350,000 | 15,752,000 |
| Proceeds for stock to be issued | - | - | 16,000 |
| Proceeds from equity line of credit - net | - | 70,000 | 70,000 |
| Contributed capital | - | - | 178,000 |
| Net cash provided by financing activities | 3,667,000 | 492,000 | 29,966,000 |
| Net increase (decrease) in cash | (213,000) | (1,116,000) | 3,000 |
| Cash at beginning of period | 544,000 | 1,119,000 | - |
| Cash at end of period | $ 331,000 | $ 3,000 | $ 3,000 |

See accompanying notes to condensed consolidated financial statements.

7

**Vicor Technologies, Inc.**
**(A Development Stage Company)**
**Condensed Consolidated Statements of Cash Flows**
**For the nine months ended September 30, 2010 and 2011 and**
**For the period from August 4, 2000 (inception) to September 30, 2011**
**(Unaudited)**

| | Nine months ended September 30, 2010 | Nine months ended September 30, 2011 | Period from August 4, 2000 (Inception) to September 30, 2011 |
|---|---|---|---|
| **Supplemental cash flow information :** | | | |
| Issuance of previously-subscribed common stock | $         - | $         - | $     16,000 |
| Conversion of accounts payable to note payable | - | - | 100,000 |
| Repurchase of common stock for cancellation of subscription note receivable | - | - | 750,000 |
| Contributed research and development | - | - | 95,000 |
| Acquisition of intellectual property from related party | - | - | 200,000 |
| Beneficial conversion features for promissory notes | - | - | 912,000 |
| Warrants issued in connection with 15% promissory notes | - | 15,000 | 276,000 |
| Warrants issued in connection with 8% Subordinated Convertible Notes | 557,000 | - | 674,000 |
| Exercise of warrants to purchase common stock | - | - | 1,000 |
| Cash paid for interest expense | 55,000 | 66,000 | 1,095,000 |
| Accrued equity-based compensation | - | - | 41,000 |
| Accrued dividends | 339,000 | 326,000 | 3,146,000 |
| Interest on promissory notes paid in common stock | - | - | 520,000 |
| Related-party accrual converted to common stock | - | - | 561,000 |
| Conversion of debt to Series B preferred stock | - | - | 1,567,000 |
| Conversion of notes to common stock | 1,206,000 | 620,000 | 6,435,000 |
| Accrued expenses paid with notes | 703,000 | - | 703,000 |
| Accrued expenses paid with preferred stock | - | - | 108,000 |
| Accrued expenses paid with common stock | - | 27,000 | 799,000 |
| Fair value of equity-based derivative financial instruments issued | 2,535,000 | - | 816,000 |
| Fair value of debt-based derivative financial instruments issued | - | 19,000 | 8,335,000 |
| Deferred costs paid with common stock | - | 34,000 | 392,000 |
| Amortization of derivative discounts | 755,000 | 747,000 | 2,092,000 |
| Conversion of Series A preferred stock and accrued dividends to common stock | 335,000 | - | 335,000 |
| Conversion of Series B preferred stock and accrued dividends to common stock | 9,000 | - | 91,000 |
| Common stock issued for equity line of credit | - | 90,000 | 90,000 |

See accompanying notes to condensed consolidated financial statements.

8

## NOTE 1 — ORGANIZATION AND NATURE OF BUSINESS

### *Organization*

Vicor Technologies, Inc. ("Vicor") is a development-stage company. Vicor began generating operating revenues in 2010, but management believes these revenues were not significant enough for Vicor to be classified as an operating enterprise at September 30, 2011.

The accompanying condensed consolidated financial statements include Vicor Technologies, Inc. and its wholly-owned subsidiaries, Nonlinear Medicine, Inc. ("NMI") and Stasys Technologies, Inc ("STI"). Vicor has no operations independent of its wholly-owned subsidiaries. NMI owns all intellectual property related to Vicor's diagnostic products, and STI owns all intellectual property related to the Company's therapeutic products.

### *Nature of the business*

Vicor is a medical diagnostics company focused on commercializing noninvasive diagnostic technology products based on its patented, proprietary point correlation dimension algorithm (the PD2i ® Algorithm"). The PD2i ® Algorithm facilitates the ability of physicians to accurately risk stratify a specific target population to predict future pathological events such as cardiac mortality (either from arrhythmic death or congestive heart failure), autonomic nervous system dysfunction and imminent death from trauma. The Company believes that the PD2i ® Algorithm represents a noninvasive monitoring technology that physicians and other members of the medical community can use as a new and accurate vital sign and is currently commercializing two proprietary diagnostic medical products which employ software utilizing the PD2i ® Algorithm: the PD2i Analyzer ™ (sometimes also referred to as the PD2i Cardiac Analyzer ™ and the *PD2i-VS ™* (Vital Sign). It is also anticipated that the PD2i ® Algorithm applications will allow for the early detection of cerebral disorders as well as other disorders and diseases.

### *Risks*

The Company has been operating since June 2011 with extremely limited available cash. A Securities Purchase Agreement ("SPA") was put in place in July 2011 (see Note 6) and the Company was able to raise $70,000 from the SPA. The Company also received $30,000 of cash loans from certain members of management. The Company desperately needs additional sources of financing. See Note 2. If such financing is not obtained, the Company may have to curtail its operations in December 2011 or may be placed in involuntary bankruptcy by its creditors.

The Company is subject to all the risks inherent in an early stage company in the biotechnology industry. The biotechnology industry is subject to rapid and technological change. The Company has numerous competitors, including major pharmaceutical and chemical companies, medical device manufacturers, specialized biotechnology firms, universities and other research institutions. These competitors may succeed in developing technologies and products that are more effective than any that are being developed by the Company or that would render the Company's technology and products obsolete and noncompetitive. Many of these competitors have substantially greater financial and technical resources and production and marketing capabilities than the Company. In addition, many of the Company's competitors have significantly greater experience than the Company in pre-clinical testing and human clinical trials of new or improved pharmaceutical products and in obtaining FDA and other regulatory approvals on products or devices for use in health care.

The Company has limited experience in conducting and managing pre-clinical testing necessary to enter clinical trials required to obtain government approvals and has limited experience in conducting clinical trials. Accordingly, the Company's competitors may succeed in obtaining FDA approval for products more rapidly than the Company, which could adversely affect the Company's ability to further develop and market its products. If the Company commences significant commercial sales of its products, it will also be competing with respect to manufacturing efficiency and marketing capabilities, areas in which the Company has limited or no experience.

## NOTE 2 — LIQUIDITY AND GOING CONCERN

The Company's financial statements as of and for the three and nine months ended September 30, 2011 have been prepared on a going concern basis, which contemplates the realization of assets and the settlement of liabilities and commitments in the normal course of business. The Company incurred a net loss of $4,806,000 for the year ended December 31, 2010. The Company had a net loss of $5,413,000 for the nine months ended September 30, 2011 which was affected by a $7,321,000 gain on derivative financial instruments. Absent this gain, the Company had a loss of $12,734,000. At September 30, 2011 the Company had a working capital deficiency of $11,594,000, an accumulated deficit of $66,194,000 and a net

capital deficiency of $12,890,000. The Company is in substantial arrears with its accounts payable, and no management salaries have been paid in the three months ended September 30, 2011. The lack of working capital has severely restricted the Company's ability to implement its sales strategies. The Company needs to continue to incur expenditures to further the commercial development of its products. These matters raise substantial doubt about the Company's ability to continue as a going concern. The financial statements do not include any adjustments that might result from the outcome of this material uncertainty.

9

Management recognizes that the Company must generate additional funds to successfully commercialize its products. Management plans include the sale of additional equity or debt securities, alliances or other partnerships with entities interested in and having the resources to support the further development of its products as well as other business transactions to assure continuation of the Company's development and operations. The Company has been working on its plan to secure additional capital through a multi-part funding strategy.

However, no assurances can be given that the Company will be successful in raising any additional capital or entering into business alliances. If the Company is not able to timely and successfully raise additional capital its business, financial condition, cash flows and results of operations will be materially and adversely affected.

Furthermore, there can be no assurance, assuming the Company successfully raises additional funds, that the Company will achieve profitability or positive cash flow. If the Company is not able to achieve positive cash flow, its business, financial condition, cash flows and results of operations will also be materially and adversely affected,

## NOTE 3 — SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES AND BASIS OF  PRESENTATION

### *Basis of Presentation*

The accompanying unaudited condensed consolidated financial statements of the Company and the notes thereto have been prepared in accordance with the instructions for Form 10-Q and Article 10 of Regulation S-X of the Securities and Exchange Commission ("SEC"). The December 31, 2010 condensed consolidated balance sheet data was derived from audited financial statements but does not include all disclosures required by accounting principles generally accepted in the United States of America. The unaudited condensed consolidated financial statements included herein should be read in conjunction with the audited consolidated financial statements and the notes thereto that are included in the Company's Annual Report on Form 10-K for the year ended December 31, 2010, filed with the SEC on March 31, 2011.

The accompanying condensed consolidated financial statements include the accounts of the Company and its wholly-owned subsidiaries. All significant intercompany accounts and transactions have been eliminated in consolidation. The Company's condensed consolidated financial statement amounts have been rounded to the nearest thousand dollars.

The information presented as of September 30, 2011 and for the three and nine months ended September 30, 2010 and 2011 has not been audited. In the opinion of management, the unaudited interim financial statements include all adjustments, consisting only of normal recurring adjustments, necessary to present fairly the Company's condensed consolidated financial position as of September 30, 2011, the condensed consolidated results of its operations for the three and nine months ended September 30, 2010 and 2011, and its condensed consolidated changes in net capital deficiency and cash flows for the nine months ended September 30, 2011. The results of operations for the three and nine months ended September 30, 2010 and 2011 are not necessarily indicative of the results for the full year.

### *Receivables*

Receivables are reported net of an allowance for doubtful accounts. The allowance is based on management's evaluation of the collectibility of outstanding balances and is zero and $17,000, respectively, at December 31, 2010 and September 30, 2011.

### *Intellectual Property*

Intellectual property, consisting of patents and other proprietary technology acquired by the Company is stated at cost and amortized on a straight-line basis over the estimated useful lives of the assets.

|  | December 31, 2010 | September 30, 2011 |
|---|---|---|
| Patents | $ 252,000 | $ 252,000 |
| Purchased software | 200,000 | 256,000 |
|  | 452,000 | 508,000 |
| Less accumulated amortization | (260,000) | (296,000) |
| Net intellectual property | $ 192,000 | $ 212,000 |

10

*Financial Instruments*

The carrying amount of financial instruments, including cash, accounts receivable, accounts payable and notes payable approximates fair value as of December 31, 2010 and September 30, 2011.

Convertible securities with detachable warrants that do not contain features requiring them to be accounted for as embedded derivatives are valued by allocating the proceeds between the warrant and the convertible security based on relative fair values, with any resulting fixed beneficial conversion feature ("BCF") embedded in the convertible security being recorded at its intrinsic value.

Convertible securities containing detachable warrants where the conversion price of the security and/or the exercise price of the warrants are affected by the current market price of the Company's common stock are accounted for as derivative financial instruments when the exercise and conversion prices are not considered to be indexed to the Company's own stock. These derivatives are recorded as a liability and presented in the consolidated balance sheet under the caption "derivative financial instruments payable in common stock".

For such issuances of convertible securities with detachable warrants, the Company initially records both the warrant and the BCF at fair value, using options pricing models common used by the financial services industry (Black-Scholes-Merton options pricing model) using inputs generally observable in the financial services industry. These derivative financial instruments are marked to market each reporting period, with unrealized changes in value reflected in earnings under the caption "gain (loss) on derivative financial instruments".

For discounts arising from issuances of instruments embedded in a debt security, the discount is accounted for as a noncurrent asset under the caption "deferred financing costs". For discounts arising from issuances of instruments embedded in an equity security, the discount is accounted for as a reduction to additional paid-in capital.

The discounts arising from the initial recording of the warrants are amortized over the term of the host security, and the discounts arising from the BCF are amortized over the period when the conversion right first becomes exercisable. The classification of the amortization is based on the nature of the host instrument. In this respect, amortization of discounts associated with debt issuances are classified as interest expense, whereas amortization of discounts associated with preferred stock issuances are classified as preferred stock dividends.

At the time a warrant is exercised or a BCF is exercised, the fair value of the derivative financial instrument at time of exercise/conversion is calculated, and a realized gain or loss on conversion is determined and reported as "gain (loss) from derivative financial instruments".

## NOTE 4 — CURRENT DEBT

At December 31, 2010 and September 30, 2011 current debt consists of:

|  | December 31, 2010 | September 30, 2011 |
|---|---|---|
| 8% Subordinated Convertible Notes | $ - | $ 5,273,000 |
| 10% Convertible Promissory Notes | - | 2,390,000 |
| 2004 Notes, 12% | 250,000 | 250,000 |
| 12% Convertible Promissory Notes | 110,000 | 85,000 |
| 15% Promissory Notes | - | 350,000 |
| Bank loan, unsecured, 3.45%, due February 2012 | - | 200,000 |
|  | $ 360,000 | $ 8,548,000 |

The Company is in technical default on both the 8% Subordinated Convertible Notes and the 10% Convertible Promissory Notes because of its inability to pay liabilities as they became due during the three months ended September 30, 2011. Consequently, the Company has classified the entire amount of the Notes as current in the accompanying Consolidated Balance Sheet at September 30, 2011, and has charged unamortized deferred financing costs of $4,201,000 to interest expense and $662,000 to selling, general and administrative expense in the accompanying Statement of Operations for the three and nine months ended September 30, 2011.

11

Additionally, the 15% Promissory Notes aggregating $350,000 are also in default. $250,000 of these notes was due to be repaid on November 11, 2001, but this did not occur. The remaining 15% Promissory Note of $100,000 is also in default as a result of nonpayment of the November interest.

### *8% Subordinated Convertible Notes*

The 8% Subordinated Convertible Notes ("8% Subordinated Notes") are due on October 7, 2012 and at issuance were subordinated to 8% Convertible Notes sold in 2009. All of the 8% Convertible Notes were converted in 2010, and the holders of the 8% Subordinated Notes may convert these notes into shares of the Company's common stock. The 8% Subordinated Notes are mandatorily convertible into shares of the Company's common stock at a conversion price equal to the lesser of $0.80 per share of common stock or 80% of the price per share of common stock sold in a qualified funding event, defined as the sale of convertible debt or equity in an offering resulting in at least $3,000,000 of gross proceeds to the Company.

The conversion rights embedded in the 8% Subordinated Notes are accounted for as derivative financial instruments because of the beneficial conversion feature embedded therein. The beneficial conversion feature was valued at date of issuance using the Black-Scholes-Merton options pricing model.

Warrants to purchase 12,500 shares of the Company's common stock at an exercise price of $1.00 per share were issued for each $10,000 of 8% Subordinated Notes sold and expire 5 years from date of issue. The warrants were valued using the Black-Scholes-Merton options pricing model.

### *10% Convertible Promissory Notes*

The 10% Convertible Promissory Notes ("10% Convertible Notes") are due on September 30, 2012 and are convertible into common stock at the option of the holder at any time prior to maturity at an initial fixed conversion price of $0.45 per share. After the 10% Convertible Notes have been outstanding for six months, the conversion price adjusts to 75% of the average of the three lowest closing bid prices during the 10-day period preceding the conversion date. If the Company conducts a registered public offering, as defined, of its common stock (or securities convertible into or exercisable for shares of common stock), the conversion price is subject to adjustment.

If the Company raises $5,000,000 or more from the sale of capital stock or debt securities, it shall offer to redeem the outstanding 10% Convertible Notes for cash at rates ranging from 110% - 115%, depending on the date of the redemption after the issue date, plus accrued but unpaid interest. The holders are not required to tender the 10% Convertible Notes for redemption.

For a financing of less than $5,000,000, the Company shall offer to redeem a pro rata portion of the 10% Convertible Notes.

Warrants to purchase 22,200 shares of the Company's common stock at $0.80 per share were issued for each $10,000 of 10% Convertible Notes sold and expire 4 years from date of issue. The warrants may be exercised in full or in part and, at the option of the holder, may be exercised on a net issuance basis.

The conversion rights embedded in the 10% Convertible Notes are accounted for as derivative financial instruments because of the beneficial conversion feature embedded therein. The beneficial conversion feature was valued at date of issuance using the Black-Scholes-Merton options pricing model.

The warrants contain an embedded net issuance feature that causes them to be accounted for as derivative financial instruments because of the variable number of common stock shares that could be issued. This was valued at date of issuance using the Black-Scholes-Merton options pricing model.

During the nine months ended September 30, 2011, $439,000 of the 10% Notes were converted into common stock as provided for by terms of the debt instrument. This resulted in a $77,000 realized gain to the Company, included in the amount reported in the condensed consolidated statement of operations as "gain on derivative financial instruments", and measured by the difference between the fair value of the beneficial conversion feature just prior to the conversion and the fair value of the beneficial conversion feature as of the most recent mark-to-market calculation. The beneficial conversion feature was valued at dates of conversion using the Black-Scholes-Merton option pricing model with the following assumptions: risk-free interest rates ranging from 0.19% to 0.83%, expected life of 1.5 years, expected volatility of 63% and dividend yield of zero. Related unamortized discount of $278,000 was recognized as interest expense as a result of the conversions.

## Other notes

The maturity of the 2004 Notes and the 12% Convertible Promissory Notes is currently being extended on a month-by-month basis by the noteholders.

The 15% Promissory Notes are unsecured and mature $250,000 in November 2011 and $100,000 in April 2012. See Note 9.

12

Since June 2011 the Company has not made interest payments on substantially all the 2004 Notes or the 12% Convertible Promissory Notes. Although none of the noteholders have taken action, the Company is in technical default on the debt.

At December 31, 2010 the bank loan bore interest at 3.54% and was due in January 2011. The bank loan was renewed at 3.45% and is currently due in February 2012. It was classified as long-term at December 31, 2010 and as current debt at September 30, 2011.

As a condition to making the loan, the bank received a Certificate of Deposit for $200,000 from the Company's Chief Executive Officer ("CEO") as standby collateral. As consideration for this standby collateral, the Company's Board of Directors authorized (i) the reimbursement of the CEO's out-of-pocket cash costs associated with this transaction, (ii) the Company's receipt of interest from the Certificate of Deposit as an offset to the Company's interest expense, and (iii) the monthly issuance of 728 shares of the Company's common stock to the CEO.

## NOTE 5 — LONG-TERM DEBT

Long-term debt consists of:

|  | December 31, 2010 | September 30, 2011 |
|---|---|---|
| 8% Subordinated Convertible Notes | $ 5,273,000 | $ — |
| 10% Convertible Promissory Notes | 2,804,000 | — |
| Bank loan, unsecured, 3.54% | 200,000 | — |
|  | $ 8,277,000 | $ — |

At September 30, 2011 all debt has been classified as current. See Note 4.

## NOTE 6 — SECURITIES PURCHASE AGREEMENT

In July 2011 the Company entered into a Securities Purchase Agreement ("SPA") with Centaurian Fund LP ("Centaurian") pursuant to which Vicor may, from time to time, issue and sell to Centaurian up to $10,000,000 of common stock over a 3-year period. Centaurian received 140,000 shares of common stock for its services related to the SPA on the date the Registration Statement became effective.

Also in July 2011 the Company filed a Registration Statement with the SEC to register 15,140,000 shares of common stock pursuant to the SPA with Centaurian. The SPA became effective on August 10, 2011, the date the registration statement became effective. The Company has the ability to register additional shares in the future through the use of additional registration statements. However, there can be no assurance that the SPA and Registration Statement will be utilized, and the actual amounts raised will depend on the Company's use of the SPA and Registration Statement as well as market conditions at those times.

During the three months ended September 30, 2011, the Company raised $90,000 under the SPA, netting $70,000 after various expenses related to the drawdowns. There were 1,550,591 shares of common stock issued to Centaurian under terms of the SPA.

## NOTE 7 — FAIR VALUE OF FINANCIAL INSTRUMENTS

The Company follows the provisions of ASC Topic 820, "Fair Value Measurements and Disclosures". This Topic defines fair value, establishes a measurement framework and expands disclosures about fair value measurements.

The Company measures financial assets in three levels, based on the markets in which the assets and liabilities are traded and the reliability of the assumptions used to determine fair value. These levels are:

- Level 1 — Valuations for assets and liabilities traded in active exchange markets, or interest in open-end mutual funds that allow a company to sell its ownership interest back at net asset value ("NAV") on a daily basis. Valuations are obtained from readily available pricing sources for market transactions involving identical assets, liabilities or funds.

- Level 2 — Valuations for assets and liabilities traded in less active dealer, or broker markets, such as quoted prices for similar assets or liabilities or quoted prices in markets that are not active.

- Level 3 — Valuations for assets and liabilities that are derived from other valuation methodologies, such as options pricing models, discounted cash flow models and similar techniques, and not based on market exchange, dealer, or broker traded transactions. Level 3 valuations incorporate certain assumptions and projections in determining the fair value assigned to such assets or liabilities.

13

The availability of observable inputs can vary from instrument to instrument and in certain cases the inputs used to measure fair value may fall into different levels of the fair value hierarchy. In such cases, an instrument's level within the fair value hierarchy is based on the lowest level of input that is significant to the fair value measurement. The Company's assessment of the significance of a particular input to the fair value measurement of an instrument requires judgment and consideration of factors specific to the instrument.

### _Recurring Fair Value Measurement Valuation Techniques_

The fair value for certain financial instruments is derived using pricing models and other valuation techniques that involve significant management judgment. The price transparency of financial instruments is a key determinant of the degree of judgment involved in determining the fair value of the Company's financial instruments. Financial instruments for which actively quoted prices or pricing parameters are available will generally have a higher degree of price transparency than financial instruments that are thinly traded or not quoted. In accordance with ASC Topic 820, the criteria used to determine whether the market for a financial instrument is active or inactive is based on the particular asset or liability. As a result, the valuation of these financial instruments included significant management judgment in determining the relevance and reliability of market information available. The Company considered the inactivity of the market to be evidenced by several factors, including limited trading of the Company's stock since the commencement of trading in July 2007.

### _Derivative Financial Instruments_

The Company's derivative financial instruments consist of conversion options embedded in 8% Subordinated Convertible Promissory Notes, 10% Convertible Notes and Series B Preferred Stock and warrants to purchase common stock issued with 10% Convertible Notes and preferred stock. These instruments are valued with pricing models commonly used by the financial services industry using inputs generally observable in the financial services industry. These models require significant judgment on the part of management, including the inputs utilized in its pricing models. The Company's derivative financial instruments are categorized in Level 3 of the fair value hierarchy. The Company estimates the fair value of derivatives utilizing the Black-Scholes-Merton option pricing model and the following assumptions:

|  | Warrants | Beneficial Conversion - Preferred Stock | Beneficial Conversion - Convertible Notes |
|---|---|---|---|
| Year ended December 31, 2010: |  |  |  |
| Risk-free interest rate | 1.27% - 2.55% | 1.27% - 2.55% | 0.64% - 1.43% |
| Expected volatility | 63% | 63% | 63% |
| Expected life (in years) | 2.25 - 4.50 | 2.25 - 4.50 | 1.50 - 3.00 |
| Expected dividend yield | 0% | 0% | 0% |
| Nine months ended September 30, 2011: |  |  |  |
| Risk-free interest rate | 0.96% - 2.54% | 0.42% - 2.54% | 0.19% - 1.64% |
| Expected volatility | 63% | 63% | 63% |
| Expected life (in years) | 1.25 - 3.25 | 1.25 - 3.50 | 1.00 - 1.59 |
| Expected dividend yield | 0% | 0% | 0% |

The Company's methodology to estimate volatility of its common stock is based on an average of published volatilities contained in the most recent audited financial statements of other publicly-reporting companies in industries similar to that of the Company.

### _Level 3 Assets and Liabilities_

Level 3 liabilities include instruments whose value is determined using pricing models and for which the determination of fair value requires significant management judgment or estimation. As of December 31, 2010 and September 30, 2011 instruments measured at fair value on a recurring basis categorized as Level 3 represented approximately 42% and 3% of the Company's total liabilities, respectively.

14

Fair values of liabilities measured on a recurring basis at as follows:

| | Fair Value | Quoted prices in active markets for identical liabilities (Level 1) | Significant other observ-able inputs (Level 2) | Significant unobservable inputs (Level 3) |
|---|---|---|---|---|
| Liabilities: | | | | |
| Derivative financial instruments - December 31, 2010 | $7,692,000 | $ - | $ - | $ 7,692,000 |
| Derivative financial instruments - September 30, 2011 | $ 390,000 | $ - | $ - | $ 390,000 |

Both observable and unobservable inputs may be used to determine the fair value of positions that the Company has classified within the Level 3 category. As a result, the gains for liabilities within the Level 3 category presented in the tables below may include changes in fair value that were attributable to both observable and unobservable inputs. The following table presents additional information about Level 3 assets and liabilities measured at fair value on a recurring basis for the nine months ended September 30, 2011:

| | Warrants | Beneficial Conversion - Preferred Stock | Beneficial Conversion - Convertible notes | Total |
|---|---|---|---|---|
| Balance, December 31, 2010 | $ 2,956,000 | $ 1,256,000 | $ 3,480,000 | $ 7,692,000 |
| Included in earnings: | | | | |
| Realized gain | - | - | (77,000) | (77,000) |
| Unrealized gain | (2,689,000) | (1,175,000) | (3,380,000) | (7,244,000) |
| Purchases, sales and other | - | - | - | - |
| Settlements and issuances - net | - | - | 19,000 | 19,000 |
| Net transfers in and/or out of Level 3 | - | - | - | - |
| Balance, September 30, 2011 | $ 267,000 | $ 81,000 | $ 42,000 | $ 390,000 |

## NOTE 8 — COMMITMENTS AND CONTINGENCIES

From time to time the Company may become subject to threatened and/or asserted claims arising in the ordinary course of business. Management is not aware of any matters, either individually or in the aggregate, that are reasonably likely to have a material adverse effect on the Company's financial condition, results of operations or liquidity.

On April 11, 2011 the Company was served with a derivative suit (styled Craig Hudson, Mark Woods and Edward Wiesmeier, derivatively on behalf of nominal defendant Vicor Technologies, Inc., a Delaware corporation, Plaintiffs vs. David H. Fater, et al., Defendants — Circuit Court of the Fifteenth Judicial Circuit, In and For Palm Beach County, Florida, Case No. 50-2011 CA 005338). This derivative suit alleges claims for breach of fiduciary duty, abuse of control and gross mismanagement against all of the directors as well as a claim for unjust enrichment against David H. Fater, the Company's President and Chief Executive Officer. On September 6, 2011 this derivative suit was dismissed without prejudice.

## NOTE 9 — SUBSEQUENT EVENTS

The Company was unable to pay a 15% promissory note with a balance of $250,000 upon maturity on November 11, 2011. No action against the Company has been taken by the noteholder through November 28, 2011.

15

**Item 2. Management's Discussion and Analysis of Financial Condition and Results of Operations.**

In this Quarterly Report on Form 10-Q, "Vicor," and the terms "Company", "we", "us" and "our" refer to Vicor Technologies, Inc. and its subsidiaries, unless the context indicates otherwise.

**Forward-Looking Statements**

This Quarterly Report on Form 10-Q includes forward-looking statements within the meaning of the Private Securities Litigation Reform Act of 1995. All statements other than statements of historical fact, including statements regarding guidance, industry prospects or future results of operations or financial condition, made in this Quarterly Report on Form 10-Q are forward-looking. We use words such as anticipates, believes, expects, future, intends and similar expressions to identify forward-looking statements. Forward-looking statements reflect management's current expectations and are inherently uncertain. Actual results could differ materially for a variety of reasons, including those risks described in our Annual Report on Form 10-K for the year ended December 31, 2010 filed with the Securities and Exchange Commission ("SEC") on March 31, 2011, and the risks discussed in other SEC filings. These risks and uncertainties as well as other risks and uncertainties could cause our actual results to differ significantly from management's expectations. The forward-looking statements included in this Quarterly Report on Form 10-Q reflect the beliefs of our management on the date of this report. We undertake no obligation to update publicly any forward-looking statements for any reason.

**Plan of Operations**

The Company is a development-stage enterprise. Operating revenues commenced in 2010, and the Company has engaged various independent sales agents and sales representatives to market and sell its products in selected geographic areas in the United States. Revenues will be predominately the result of equipment sales, fees from physicians and other health-care providers related to the analysis of test results and licensing fees.

In April 2011 the Company received 510(k) clearance from the U.S. Food and Drug Administration for its PD2i ® nonlinear algorithm and software to be used as a measure of heart rate variability at rest and in response to controlled exercise and paced respiration (Ewing Maneuvers) in patients specifically undergoing cardiovascular disease testing. Physician use of the PD2i Analyzer™ is supported by an expanding body of literature demonstrating the value of the PD2i ® nonlinear algorithm as a metric for risk stratifying specific target populations for future pathological events, including cardiovascular disease patients for death resulting from arrhythmia or congestive heart failure, diabetics for the presence of diabetic autonomic neuropathy (DAN) and trauma victims for imminent death absent immediate lifesaving intervention.

This approval enables Vicor to market the PD2i Analyzer™ directly to cardiologists as a diagnostic specifically targeted for use in cardiovascular disease testing, including the Ewing Maneuvers which are performed during PD2i Analyzer™ ECG data collection. We view this as recognition of the PD2i Analyzer™ as a meaningful metric for cardiovascular testing and validation of, from a regulatory perspective, our use of the Internet for the delivery of test data and analyses. While cardiologists are already among users of the PD2i Analyzer™ as a diagnostic for heart rate variability, which is a widely-accepted measure of autonomic nervous system health and by extension cardiac health, we believe this new clearance will contribute positively to our cardiologist-directed marketing efforts of the PD2i Analyzer™ and spur market acceptance of the PD2i Analyzer™ as a valuable new diagnostic for cardiovascular disease testing.

Our plan of operations consists of:

1. Increasing sales of the PD2i Analyzer™ to physicians and health care facilities in the United States through the use of independent sales agents and direct sales personnel.

2. Raising additional capital with which to expand the sales and administrative infrastructure and fund ongoing operations until our operations generate positive cash flow.

3. Completing various clinical trials and 510(k) submissions to secure additional marketing claims for the PD2i Analyzer™ to enhance and accelerate marketing efforts.

4. Initiating international sales of the PD2i Analyzer™ and PD2i- *VS* ™ (Vital Sign), including securing CE Mark Clearance.

However, we cannot assure that we will be successful in raising additional capital to implement our business plan.

Further, we cannot assure, assuming that we raise additional funds, that we will achieve profitability or positive cash flow. If we are not able to timely and successfully raise additional capital and/or achieve profitability and positive cash flow, our operating business, financial condition, cash flows and results of operations may be materially and adversely affected.

16

**Critical Accounting Estimates**

The following are deemed to be the most significant accounting estimates affecting us and our results of operations:

*Research and Development Costs*

Research and development costs include payments to collaborative research partners and costs incurred in performing research and development activities, including wages and associated employee benefits, facilities and overhead costs. These are expensed as incurred.

*Intellectual Property*

Intellectual property, consisting of patents and other proprietary technology, are stated at cost and amortized on the straight-line basis over their estimated useful economic lives. Costs and expenses incurred in creating intellectual property are expensed as incurred. The cost of purchased intellectual property is capitalized. Software development costs are expensed as incurred.

*Revenue Recognition*

The Company recognizes revenue when it is realized or realizable and earned. Revenue is considered realized and earned when persuasive evidence of an arrangement exists; delivery has occurred or services have been rendered; fees to the customer are fixed or determinable; and collection of the resulting receivable is reasonably assured.

The Company sells equipment to physicians and other health care providers ("Customer" or "Customers") through both sales representatives employed by the Company and also independent sales agents. Revenues from equipment sales to Customers are generally recognized when title transfers to the Customer, typically upon delivery and acceptance, and includes training that is provided at the time of product delivery. Revenues from sales of equipment to independent sales agents to be used by the agents as demonstration units are recognized upon shipment.

The Company's normal payment terms are net 30 days. However, in those cases where the Company grants extended payment terms to a Customer, the Company defers revenue recognition until Customer acceptance of the equipment.

The Company also enters into lease agreements for certain equipment sales. Revenue from the leases is recognized ratably over the term of the lease.

Revenues from the analysis of test results are recognized upon provision of the test results to the Customers.

*Accounting for Stock-Based Compensation*

The Company uses the fair value-based method of accounting for stock-based employee compensation arrangements under which compensation cost is determined using the fair value of stock-based compensation determined as of the grant date and is recognized over the periods in which the related services are rendered.

The Company has also granted stock purchase warrants to independent consultants and contractors and values these warrants using the fair value-based method described in the preceding paragraph. The compensation cost so determined is recognized over the period the services are provided which usually results in compensation cost being recognized at the date of the grant.

*Accounting for Derivative Financial Instruments*

We evaluate financial instruments using the guidance provided by ASC 815 and apply the provisions thereof to the accounting of items identified as derivative financial instruments not indexed to our stock.

*Fair Value of Financial Instruments*

The Company follows the provisions of ASC 820. This Topic defines fair value, establishes a measurement framework and expands disclosures about fair value measurements.

The Company uses fair value measurements for determining the valuation of derivative financial instruments payable in

shares of its common stock. This primarily involves option pricing models that incorporate certain assumptions and projections to determine fair value. These require management judgment.

**Results of Operations**

As a development stage enterprise, Vicor began generating revenues in 2010. Because the revenue volume is low relative to operating expenses and other gains and/or losses, management believes the most informative presentation is to present and comment separately on revenues and cost of sales, operating expenses and gain/loss on derivative financial instruments.

17

Since June 2011 the Company has been operating substantially without cash. Personnel losses at all levels have placed heavy burdens on its remaining employees and independent sales representatives to generate revenues and maintain the Company's operations. Revenues have been negatively impacted in the marketplace by the Company's lack of resources and the substantial risk of its ability to continue to operate as a going concern. These factors have resulted in market resistance on the part of certain sales representatives and buyers and have hampered the Company in implementing alternate sales strategies.

*Revenues and cost of sales*

| | Three months ended September 30, | | | |
| | 2010 | | 2011 | |
|---|---|---|---|---|
| Revenue: | | | | |
| Sales | $ 14,000 | 100.0% | $ 48,000 | 88.9% |
| Lease income | - | 0.0% | 6,000 | 11.1% |
| | 14,000 | 100.0% | 54,000 | 100.0% |
| Cost of revenue | 1,000 | 7.1% | 21,000 | 38.9% |
| Gross profit | $ 13,000 | 92.9% | $ 33,000 | 61.1% |

| | Nine months ended September 30, | | | |
| | 2010 | | 2011 | |
|---|---|---|---|---|
| Revenue: | | | | |
| Sales | $ 122,000 | 100.0% | $ 336,000 | 93.1% |
| Lease income | - | 0.0% | 25,000 | 6.9% |
| | 122,000 | 100.0% | 361,000 | 100.0% |
| Cost of revenue | 88,000 | 72.1% | 177,000 | 49.0% |
| Gross profit | $ 34,000 | 27.9% | $ 184,000 | 51.0% |

*Operating expenses and gain on derivative financial instruments*

| | Three months ended September 30, | | | |
| | 2010 | | 2011 | |
|---|---|---|---|---|
| Operating expenses: | | | | |
| Research and development | $ 161,000 | 8.2% | $ 167,000 | 2.3% |
| Selling, general and administrative | 1,353,000 | 68.6% | 1,837,000 | 25.1% |
| Interest | 458,000 | 23.2% | 5,301,000 | 72.6% |
| Total operating expenses | $1,972,000 | 100.0% | $7,305,000 | 100.0% |
| | | | | |
| Gain on derivative financial instruments | $1,142,000 | | $ 903,000 | |

| | Nine months ended September 30, | | | |
| | 2010 | | 2011 | |
|---|---|---|---|---|
| Operating expenses: | | | | |
| Research and development | $ 511,000 | 8.3% | $ 452,000 | 3.5% |
| Selling, general and administrative | 4,210,000 | 68.1% | 4,962,000 | 38.4% |
| Interest | 1,461,000 | 23.6% | 7,504,000 | 58.1% |
| Total operating expenses | $6,182,000 | 100.0% | $12,918,000 | 100.0% |
| | | | | |
| Gain on derivative financial instruments | $1,479,000 | | $ 7,321,000 | |

18

**Three months ended September 30, 2011 compared to the three months ended September 30, 2010**

*Research and Development*

Research and development costs increased $6,000 for the three months ended September 30, 2011 compared to 2010.

*Selling, General and Administrative Expenses*

Selling, general and administrative expenses increased $484,000 for the three months ended September 30, 2011. Significant components of the net increase include:

- As discussed under Results of Operations the Company operated in the three months ended September 30, 2011 with substantially no cash. This resulted in curtailments in all phases of operations:

    o   Personnel costs decreased $42,000.
    o   Marketing and travel decreased $72,000.
    o   Investor relations and cost of printing and reproduction decreased $14,000.
    o   Consulting fees decreased $152,000. This was affected by 2010 consulting fees incurred to assist the Company to build up its marketing, operations and technology infrastructure to support the commercialization of the PD2i ® Algorithm.

- Amortization of fees included in deferred financing costs increased by $766,000, primarily the result of expensing costs associated with 8% Subordinated Notes and 10% Convertible Notes deemed to be in default.

*Interest Expense*

Interest expense increased $4,843,000 for the three months ended September 30, 2011, most of which did not require the expenditure of cash. The increase was primarily caused by $469,000 of increased amortization of derivative discounts and debt discount for certain nonderivative warrants, $4,201,000 resulting from the expensing of derivative discounts and debt discount for certain nonderivative warrants for debt associated with 8% Subordinated Notes and 10% Convertible Notes deemed to be in default, and $70,000 of interest on our debt instruments. Interest expense recognized on the conversion of 8% Notes in 2010 and 10% Notes in 2011 was $103,000 greater in 2011.

*Gain on derivative financial instruments*

The gain on derivative financial instruments decreased $239,000 for the three months ended September 30, 2011. The downward movement in the Company's stock price continued in the third quarter of 2011, however, the combination of very low stock prices and risk-free interest rates used in the Black-Scholes-Merton options pricing model to calculate the fair values resulted in the 2011 gain being less than that for 2010. The fair value resulting from the periodic mark-to-market calculation varies inversely to the change in the stock price used in the Black-Scholes-Merton options pricing model.

**Nine months ended September 30, 2011 compared to the nine months ended September 30, 2010**

*Research and Development*

Research and development costs decreased $59,000 for the nine months ended September 30, 2011 compared to 2010. This was primarily the result of lower costs of clinical studies and increased research by independent researchers.

*Selling, General and Administrative Expenses*

Selling, general and administrative expenses increased $752,000 for the nine months ended September 30, 2011. See comments above regarding the Company's cash availability. Significant components of the net increase include:

- Decrease of $133,000 in payroll and related costs were affected by a decrease in 2011 in equity-based compensation expense. There were numerous management hires in the first quarter of 2010 with stock and stock option incentives. Recurring payroll costs increased $164,000 due to higher sales-related payroll and increased employee benefit costs during the first six months of the year.
- Marketing and travel expense decreased $108,000.
- Consulting fees decreased $345,000. This was affected by the 2010 consulting fees incurred to assist the Company

to build up its marketing, operations and technology infrastructure to support the commercialization of the PD2i ®
Algorithm as well as costs of securing financing in 2010. These did not recur in 2011.

- Amortization of certain fees included in deferred financing costs increased 2011 expense by $937,000, primarily
the result of expensing costs associated with 8% Subordinated Notes and 10% Convertible Notes deemed to be in
default.

19

- Professional fees increased $111,000. The primary factor affecting the increase was the write off of $150,000 of deferred financing costs incurred in 2010 for a public offering that was withdrawn in 2011.
- Investor relations and related printing costs increased $222,000 over 2010 primarily because of large contracts entered into during the first six months of 2011 and the write off of $55,000 of deferred financing costs for printing in 2010 for a public offering that was withdrawn in 2011.

### *Interest Expense*

Interest expense increased $6,043,000 for the nine months ended September 30, 2011, most of which did not require the expenditure of cash. The increase was primarily caused by $1,508,000 of increased amortization of derivative discounts and debt discount for certain nonderivative warrants, $4,201,000 resulting from the expensing of derivative discounts and debt discount for certain nonderivative warrants associated with 8% Subordinated Notes and 10% Convertible Notes deemed to be in default, and $313,000 of interest on our debt instruments.

### *Gain on derivative financial instruments*

The gain on derivative financial instruments increased $5,842,000 for the nine months ended September 30, 2011. The primary reason for the increase was the downward movement in the Company's stock price in the third quarter of 2011. The fair value resulting from the periodic mark-to-market calculation varies inversely to the change in the stock price used in the Black-Scholes-Merton options pricing model.

### Liquidity and Capital Resources

The Company has been operating since June 2011 with extremely limited available cash. A Securities Purchase Agreement ("SPA") was put in place in July 2011, and the Company was able to raise $70,000 from the SPA. The Company also received $30,000 of cash loans from certain members of management. The Company desperately needs additional sources of financing. If such financing is not obtained, the Company may have to curtail its operations in December 2011 or be placed in involuntary bankruptcy by its creditors.

We generated revenues of $361,000 in the nine months ended September 30, 2011, which compares very favorably to 2010 annual total revenues of $189,000. Our revenues are not yet sufficient to fully execute our business plan and continue development of our products. The Company is in substantial arrears with its accounts payable and no management salaries have been paid for the three months ended September 30, 2011. The Company needs to continue to incur expenditures to further the commercial development of its products. These matters raise substantial doubt about the Company's ability to continue as a going concern.

At September 30, 2011 we had a working capital deficiency of $11,594,000 and $3,000 in cash. Based on our cash balance as of November 11, 2011, management believes that we do not have sufficient funds to continue current operations through the end of December 2011. We anticipate a significant financing event in the immediate future. This includes short-term borrowings and sales of equity and debt.

In July 2011 the Company entered into a Securities Purchase Agreement ("SPA") with Centaurian Fund LP ("Centaurian") pursuant to which Vicor may, from time to time, issue and sell to Centaurian up to $10,000,000 of common stock over a 3-year period.

Also in July 2011 the Company filed a Registration Statement with the SEC to register 15,140,000 shares of common stock pursuant to the SPA with Centaurian. The SPA became effective on August 10, 2011, the date the registration statement became effective. The Company has the ability to register additional shares in the future through the use of additional registration statements. However, there can be no assurance that the SPA and Registration Statement will be utilized, and the actual amounts raised will depend on the Company's use of the SPA and Registration Statement as well as market conditions at those times.

We engaged in no significant financing activities during the three months ended September 30, 2011. We were able to access the SPA for $70,000 in the third quarter, and we received $30,000 of cash loans from certain members of management As of September 30, 2011 our primary debt instruments consist of 8% Subordinated Convertible Notes ("8% Subordinated Notes") and 10% Convertible Promissory Notes ("10% Convertible Notes").

The 8% Subordinated Notes are due in October 2012, and there are currently no restrictions on their conversion into common stock. The 8% Subordinated Notes are mandatorily convertible into shares of the Company's common stock at a

conversion price equal to the lesser of $0.80 per share of common stock or 80% of the price per share of common stock sold in a qualified funding event, defined as the sale of convertible debt or equity in an offering resulting in at least $3,000,000 of gross proceeds to the Company. Once the 8% Subordinated Notes are converted into shares of common stock, this will eliminate the indebtedness represented by the 8% Subordinated Notes and result in there being no further interest burden to the Company for the 8% Subordinated Notes.

20

Warrants to purchase 12,500 shares of the Company's common stock at $1.00 per share were issued for each $10,000 of 8% Subordinated Notes sold and expire 5 years from date of issue.

The 10% Convertible Notes are due in September 2012 and are convertible into common stock at the option of the holder at any time prior to maturity at a conversion price of 75% of the average of the three lowest closing bid prices during the 10-day period preceding the conversion date. If the Company conducts a registered public offering, as defined, of its common stock (or securities convertible into or exercisable for shares of common stock), the conversion price is subject to adjustment.

If the Company raises $5,000,000 or more from the sale of capital stock or debt securities, it shall offer to redeem the 10% Convertible Notes for cash at rates ranging from 110% - 115%, depending on the date of the redemption after the issue date, plus accrued but unpaid interest. The holders are not required to tender the 10% Convertible Notes for redemption.

For a financing of less than $5,000,000, the Company shall offer to redeem a pro rata portion of the 10% Convertible Notes.

Warrants to purchase 22,200 shares of the Company's common stock at $0.80 per share were issued for each $10,000 of 10% Convertible Notes sold and expire 4 years from date of issue. The warrants may be exercised in full or in part and, at the option of the holder, may be exercised on a cashless basis.

In April 2011 the holders of the 10% Convertible Notes began the process of converting their notes into shares of common stock under the supervision of an independent investment manager. Such conversions are expected to be handled in an orderly manner, one that we expect not to have a significant impact on our common stock prices. The conversions are expected to be completed in approximately six months.

We have raised approximately $27,000,000 since our inception in 2000 in a series of private placements of our common stock, convertible preferred stock and convertible notes to accredited investors, a number of whom are physicians.

However, we may not be successful in raising additional capital. Further, assuming that we raise additional funds, the Company may not achieve profitability or positive cash flow. If we are not able to timely and successfully raise additional capital and/or achieve profitability or positive cash flow, our operating business, financial condition, cash flows and results of operations may be materially and adversely affected.

**Going Concern**

The Company's financial statements as of and for the three and nine months ended September 30, 2011 have been prepared on a going concern basis, which contemplates the realization of assets and the settlement of liabilities and commitments in the normal course of business. The Company incurred a net loss of $4,806,000 for the year ended December 31, 2010. The Company had a net loss of $5,413,000 for the nine months ended September 30, 2011 which was affected by a $7,321,000 gain on derivative financial instruments. Absent this gain, the Company had a loss of $12,734,000. At September 30, 2011 the Company had a working capital deficiency of $11,594,000, an accumulated deficit of $66,194,000 and a net capital deficiency of $12,890,000. The Company is in substantial arrears with its accounts payable, and no management salaries have been paid in the three months ended September 30, 2011 . The lack of working capital has severely restricted the Company's ability to implement its sales strategies. The Company needs to continue to incur expenditures to further the commercial development of its products. These matters raise substantial doubt about the Company's ability to continue as a going concern. The financial statements do not include any adjustments that might result from the outcome of this material uncertainty.

Management recognizes that the Company must generate additional funds to successfully commercialize its products. Management plans include the sale of additional equity or debt securities, alliances or other partnerships with entities interested in and having the resources to support the further development of its products as well as other business transactions to assure continuation of the Company's development and operations. The Company has been working on its plan to secure additional capital through a multi-part funding strategy.

However, no assurances can be given that the Company will be successful in raising additional capital or entering into business alliances. Further, there can be no assurance, assuming the Company successfully raises additional funds or enters into a business alliance, that the Company will achieve profitability or positive cash flow. If the Company is not able to timely and successfully raise additional capital and/or achieve positive cash flow, its business, financial condition, cash flows and results of operations will be materially and adversely affected, and the Company may have to curtail its operations in December 2011 or be placed in involuntary bankruptcy by its creditors.

**Off-Balance Sheet Arrangements**

We have not entered into any transaction, agreement or other contractual arrangement with an unconsolidated entity under which we have:

21

- A retained or contingent interest in assets transferred to the unconsolidated entity or similar arrangement that serves as credit;

- Liquidity or market risk support to such entity for such assets; or

- An obligation, including a contingent obligation, arising out of a variable interest in an unconsolidated entity that is held by, and material to us, where such entity provides financing, liquidity, market risk or credit risk support to, or engages in leasing, hedging, or research and development services with us.

**Item 3. Quantitative and Qualitative Disclosures about Market Risk.**

Not applicable.

**Item 4. Controls and Procedures.**

(a) Evaluation of Disclosure Controls and Procedures

As of the end of the period covered by this report, we conducted an evaluation, under the supervision and with the participation of David H. Fater, our Co-Chief Executive Officer, James E. Skinner, our Co-Chief Executive Officer, and Thomas J. Bohannon, our Chief Financial Officer, of our disclosure controls and procedures (as defined in Rule 13a-15(e) and Rule 15d-15(e) of the Exchange Act). Based upon this evaluation, our Co-Chief Executive Officers and our Chief Financial Officer concluded that at September 30, 2011 our disclosure controls and procedures are effective to ensure that information required to be disclosed by us in the reports that we file or submit under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the Commission's rules and forms and that such information is accumulated and communicated to our management, including our principal executive officer and principal financial officer, or persons performing similar functions, as appropriate, to allow timely decisions regarding required disclosure.

(b) Changes in Internal Controls

There was no change in our internal controls or in other factors that could affect these controls during the quarter ended September 30, 2011 that has materially affected, or is reasonably likely to materially affect, our internal controls over financial reporting.

## PART II — OTHER INFORMATION

**Item 1. Legal Proceedings.**

See Note 8 — Commitments and Contingencies in the Notes to Condensed Consolidated Financial Statements contained in Part I, Item 1 of this Quarterly Report for information about legal proceedings in which we are involved.

**Item 2. Unregistered Sales of Equity Securities and Use of Proceeds.**

During the three months ended September 30 2011, Vicor:

- Issued 137,250 shares of common stock as a result of the exercise of warrants.

- Issued 3,165,038 shares of common stock upon the conversion of $191,000 principal amount of 10% Notes and $10,000 of accrued interest.

- Issued 412,628 shares of common stock to employees and consultants for services rendered.

These securities issued in the foregoing transactions were exempt from registration under Section 4(2) of the Securities Act of 1933, as amended ("Securities Act") or Rule 506 of Regulation D, as transactions by an issuer not involving a public offering. All of the investors were knowledgeable, sophisticated and had access to comprehensive information about the Company and represented their intention to acquire the securities for investment only and not with a view to distribute or sell the securities. No general advertising or solicitation was used in selling the securities and no commissions or broker's fees were paid for the sale of the securities. The Company placed legends on the certificates stating that the securities were not registered under the Securities Act and set forth the restrictions on their transferability and sale.

**Item 3. Defaults Upon Senior Securities.**

The Company is in technical default on both the 8% Subordinated Convertible Notes and the 10% Convertible Promissory Notes because of its inability to pay liabilities as they became due during the three months ended September 30, 2011.

<div align="center">22</div>

The 15% Promissory Notes aggregating $350,000 are also in default. $250,000 of these notes was due to be repaid on November 11, 2011, but this did not occur. The remaining 15% Promissory Note of $100,000 is also in default as a result of nonpayment of the November interest.

Since June 2011 the Company has not made interest payments on substantially all the 2004 Notes or the 12% Convertible Promissory Notes. The Company is in technical default on the debt.

**Item 4. Reserved and removed.**

None.

**Item 5. Other Information.**

None.

**Item 6. Exhibits**

| Exhibit No. | Description |
| --- | --- |
| 31.1 | Certification of David H. Fater, Co-Chief Executive Officer and President, pursuant to Rule 13a-14(a) of the Securities Exchange Act of 1934.* |
| 31.2 | Certification of Thomas J. Bohannon, Chief Financial Officer, pursuant to Rule 13a-14(a) of the Securities Exchange Act of 1934.* |
| 31.3 | Certification of James E. Skinner, Co-Chief Executive Officer, pursuant to Rule 13a-14(a) of the Securities Exchange Act of 1934.* |
| 32.1 | Certification of David H. Fater, Co-Chief Executive Officer and President of Vicor Technologies, Inc., pursuant to 18 U.S.C. 1350.* |
| 32.2 | Certification of Thomas J. Bohannon, Chief Financial Officer of Vicor Technologies, Inc., pursuant to 18 U.S.C. 1350.* |
| 32.3 | Certification of James E. Skinner, Co-Chief Executive Officer of Vicor Technologies, Inc., pursuant to 18 U.S.C. 1350.* |

\* Filed herewith

**SIGNATURES**

In accordance with the requirements of the Securities Exchange Act of 1934, as amended, the Registrant has duly caused this Report to be signed on its behalf by the undersigned thereunto duly authorized.

Dated: December 8, 2011

Vicor Technologies, Inc.

By: /s/ David H. Fater
David H. Fater
Co-Chief Executive Officer and President

By: /s/ James E. Skinner
James E. Skinner
Co-Chief Executive Officer

By: /s/ Thomas J. Bohannon
Name: Thomas J. Bohannon
Title: Chief Financial Officer

23

<div align="right">**Exhibit 31.1**</div>

<div align="center">**CERTIFICATIONS**</div>

I, David H. Fater, certify that:

1.  I have reviewed this quarterly report on Form 10-Q of Vicor Technologies, Inc.;

2.  Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.  Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.  The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal controls over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    a)  Designed such disclosure controls and procedures or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    b)  Designed such internal controls over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    c)  Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    d)  Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.  The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    a)  All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    b)  Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Dated: December 8, 2011

<div style="margin-left:50%">
/s/ David H. Fater
_____

David H. Fater
Co-Chief Executive Officer and President
</div>

Exhibit 31.2

## CERTIFICATIONS

I, Thomas J. Bohannon, certify that:

1.  I have reviewed this quarterly report on Form 10-Q of Vicor Technologies, Inc.;

2.  Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.  Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.  The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    a)  Designed such disclosure controls and procedures or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    b)  Designed such internal controls over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    c)  Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    d)  Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.  The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    a)  All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    b)  Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Dated: December 8, 2011


/s/ Thomas J. Bohannon
Thomas J. Bohannon
Chief Financial Officer

Exhibit 31.3

## CERTIFICATIONS

I, James E. Skinner, certify that:

1.  I have reviewed this quarterly report on Form 10-Q of Vicor Technologies, Inc.;

2.  Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.  Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.  The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    a)  Designed such disclosure controls and procedures or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    b)  Designed such internal controls over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    c)  Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    d)  Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.  The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    a)  All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    b)  Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Dated: December 8, 2011

/s/ James E. Skinner
James E. Skinner
Co-Chief Executive Officer

**Exhibit 32.1**

## CERTIFICATION PURSUANT TO

## 18 U.S.C. SECTION 1350,

## AS ADOPTED PURSUANT TO

### SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002

In connection with the Quarterly Report of Vicor Technologies, Inc. (the "Company") on Form 10-Q for the fiscal quarter ended September 30, 2011 as filed with the Securities and Exchange Commission on the date hereof (the "Report"), I, David H. Fater, certify, pursuant to 18 U.S.C. ss. 1350, as adopted pursuant to ss. 906 of the Sarbanes-Oxley Act of 2002, that to my knowledge:

(1)   The Report fully complies with the requirements of section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

(2)   The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

Dated: December 8, 2011

/s/ David H. Fater
David H. Fater
Co-Chief Executive Officer and President

Exhibit 32.2

# CERTIFICATION PURSUANT TO

## 18 U.S.C. SECTION 1350,

## AS ADOPTED PURSUANT TO

## SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002

In connection with the Quarterly Report of Vicor Technologies, Inc. (the "Company") on Form 10-Q for the fiscal quarter ended September 30, 2011 as filed with the Securities and Exchange Commission on the date hereof (the "Report"), I, Thomas J. Bohannon, certify, pursuant to 18 U.S.C. ss. 1350, as adopted pursuant to ss. 906 of the Sarbanes-Oxley Act of 2002, that to my knowledge:

(1)     The Report fully complies with the requirements of section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

(2)     The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

Dated: December 8, 2011

/s/ Thomas J. Bohannon
Thomas J. Bohannon
Chief Financial Officer

Exhibit 32.3

## CERTIFICATION PURSUANT TO

## 18 U.S.C. SECTION 1350,

## AS ADOPTED PURSUANT TO

### SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002

In connection with the Quarterly Report of Vicor Technologies, Inc. (the "Company") on Form 10-Q for the fiscal quarter ended September 30, 2011 as filed with the Securities and Exchange Commission on the date hereof (the "Report"), I, James E. Skinner, certify, pursuant to 18 U.S.C. ss. 1350, as adopted pursuant to ss. 906 of the Sarbanes-Oxley Act of 2002, that to my knowledge:

(1)   The Report fully complies with the requirements of section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

(2)   The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

Dated: December 8, 2011

/s/ James E. Skinner
James E. Skinner
Co-Chief Executive Officer