UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH DIVISION
www.flsb.uscourts.gov

| | |
|---|---|
| In re<br><br>VICOR TECHNOLOGIES, INC.,<br><br>    Alleged Debtor. | Case No. 12-39329-BKC-EPK<br><br>Involuntary Chapter 7 |

### PETITIONING CREDITORS' MOTION FOR SUMMARY JUDGMENT

The petitioning creditors identified below (the "Petitioning Creditors"),[1] by and through undersigned counsel and pursuant to 11 U.S.C. § 303(b) and (h), and Federal Rules of Bankruptcy Procedure 1018 and 7056, move for summary judgment on their involuntary bankruptcy petition and request for entry of an order for relief herein, and in support thereof state as follows:

### BACKGROUND

### Procedural History

1. On December 7, 2012, the 13 Petitioning Creditors filed an involuntary petition against Alleged Debtor, Vicor Technologies, Inc. ("Vicor") under chapter 7 of the United States Bankruptcy Code. No order for relief has been entered and no trustee has been appointed.

2. On December 21, 2012, the Court entered an order restricting Vicor's rights to transfer or dispose of its intellectual property during the "involuntary gap period" pending adjudication of the involuntary petition under 11 U.S.C. § 303(f). ECF # 17.

3. On January 9, 2013, Vicor contested the involuntary petition under Federal Rule of Bankruptcy Procedure 1011(b) by filing a motion to dismiss the involuntary petition and for related relief [ECF # 34], which is scheduled for preliminary hearing on January 24, 2013, at 1:30 p.m.

---

[1]     The 13 petitioning creditors are David H. Fater, Richard M. Cohen, T.J. Bohannon, Inc., Target Health, Inc., Robin Schoen Public Relations, Sclafani & Associates, P.A., Jerry M. Anchin, Dr. David Krasnow, Christopher Vissman, Santiago Guzman, Riley Vanhofwegen, Opus Financial Group and Giordano & Associates Co., Inc.

**Vicor Background**

4. Vicor is a medical diagnostics company formed in 2000 and headquartered in Boca Raton, Florida, focused on developing and commercializing medical diagnostic products using its patented PD2i® algorithm and software, which enables physicians to accurately risk stratify a specific target population to predict future pathological events, such as autonomic nervous system dysfunction, cardiac mortality (either from arrhythmic death or congestive heart failure) and imminent death from trauma. As of 2011, Vicor was commercializing two diagnostic products which employ software using the PD2i® algorithm: the PD2i Analyzer™ (sometimes referred to as the PD2i Cardiac Analyzer™) and the PD2i-VS™ (Vital Sign), and held three U.S. registered trademarks for these products. The PD2i® algorithm patents and related intellectual property are actually owned by Vicor's wholly-owned subsidiary, Nonlinear Medicine, Inc.

5. The PD2i Analyzer™ received section 510(k) marketing clearance from the U.S. Food and Drug Administration ("FDA") in December, 2008, and sales of this product commenced in January, 2010. By the end of 2010, Vicor had contracted 27 independent sales representatives in over 30 states and the District of Columbia, and had begun hiring in-house sales personnel in selected states to supplement its outside sales force.

6. The principal customers for Vicor's PD2i Analyzer™ were physicians specializing in family practice and internal medicine, as well as endocrinologists. In addition to its domestic marketing strategy, Vicor marketed its products internationally through foreign distribution partners, and in fact had distribution agreements for the People's Republic of China, Australia, Israel and Palestine.

7. From 2003 through 2011, Vicor raised over $30 million in capital and achieved the following significant milestones:

- Obtained domestic and international patents for the PD2i® algorithm;
- Obtained two FDA section 510-K marketing clearances in 2008 and 2011;
- Developed an innovative and proprietary internet delivery-based system for analysis;
- Commenced commercial sales to physicians in the United States;
- Developed a second generation ECG and laptop collection device with a major equipment manufacturer;
- Secured an exclusive distribution agreement with the People's Republic of China pending completion of Chinese regulatory review and approval.
- Secured an exclusive distribution agreement for Israel and Palestine pending completion of Israeli Health Authority review, though the technology is in use by the Israeli Defense Force and the prestigious Wingate Institute;
- Conducted numerous clinical trials at major universities for various modalities, including concussion, anesthesia, ER triage and others;
- Gained recognition of the PD2i Analyzer for use in a wide range of modalities and disease states with over 50 peer-reviewed published manuscripts and poster presentations at the American Heart Association, American College of Cardiology and Society for Critical Care Medicine.

8. Unfortunately, however, Vicor's start-up developmental expenses were very high and depleted the company's working capital by 2011. For example, Vicor's research and development expenses for 2009-2010 alone totaled approximately $1.6 million. These expenses included laboratory supplies, hardware costs, programming and software costs, sponsored research activities and salary and fringe benefit costs for employees who were engaged in research, development, clinical and regulatory activities, as well as clinical trial costs, clinical and regulatory consulting, and manufacturing costs.

9. In 2010-11, a series of financings were planned that could have enabled Vicor's success but an internal dispute between the shareholders, board of directors and management resulted in a shareholder derivative action filed against Vicor and its directors. This lawsuit was ultimately settled but, in the opinion of former management who are among the petitioners, it prevented consummation of the financing. As a result, Vicor ran out of cash in or around May, 2011, and most of Vicor management team, including four of the Petitioning Creditors, resigned in December 2011, out of frustration with the Board and the circumstances that gave rise to the shareholder derivative

3

suit.

10. In March, 2011, Vicor had 16 employees and engaged the services of several outside consultants. Thirteen of these employees were engaged in executive, administrative, business development, sales, marketing and intellectual property functions, and three were engaged in research, development and clinical/regulatory activities. Upon information and belief, Vicor is now being operated solely by its interim CEO and only remaining officer, James Skinner, and, upon information and belief, its only business activity is to service those physicians who are still using the company's diagnostic products rather than marketing existing products and developing new products.

11. The Petitioning Creditors believe that Vicor has no working capital or financing prospects, and that its only assets of significant value are its patented and trademarked intellectual property now being wasted rather than developed and marketed. Vicor was deactivated by the Florida Secretary of State in September, 2011 (see www.sunbiz.org) and, upon information and belief, has not paid its vendors in over 18 months. Vicor is not current in any of its required SEC filings and has failed to formally communicate with its shareholders. Upon information and belief, Vicor has over $13 million in undisputed liabilities, including two classes of convertible notes, all of which are significantly past due. The sworn declaration of Mr. David H. Fater, a petitioning creditor and Vicor's former CEO, attesting to the background facts and circumstances described above, is attached as Exhibit A to ECF # 9 filed in this proceeding, and incorporated by reference herein.

**RELIEF REQUESTED**

12. The Petitioning Creditors seek summary judgment, pursuant to Federal Rules of Bankruptcy Procedure 1018 and 7056, on their involuntary bankruptcy petition pursuant to 11 U.S.C. § 303(b) and (h).

**I.      Standard for Summary Judgment**

13.     Summary judgment is appropriate when there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56 (made applicable hereto by Fed. R. Bankr. P. 7056). Summary judgment should be granted by a court "if the pleadings, depositions, answers to interrogatories, and admissions on file together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). "[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which the party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

14.     For the reasons stated below, the Petitioning Creditors believes that no genuine issue of material fact exists and that they are entitled to judgment as a matter of law on each of the factual issues they need to prove as a condition to entry of an order for relief on their contested involuntary bankruptcy petition under 11 U.S.C. § 303 – specifically, eligibility under section 303(b) and the "generally not paying" issue under section 303(h).

**II.     Petitioning Creditors are Eligible Under 11 U.S.C. § 303(b)**

15.     Section 303(b) provides:

(b) An involuntary case against a person is commenced by the filing with the bankruptcy court of a petition under chapter 7 or 11 of this title—

(1)     by three or more entities, each of which is either a holder of a claim against such person that is not contingent as to liability or the subject of a bona fide dispute as to liability or amount, or an indenture trustee representing such a holder, if such noncontingent, undisputed claims aggregate at least $10,000 more than the value of any lien on property of the debtor securing such claims held by the holders of such claims;

5

> (2) if there are fewer than 12 such holders, excluding any employee or insider of such person and any transferee of a transfer that is voidable under section 544, 545, 547, 548, 549, or 724(a) of this title, by one or more of such holders that hold in the aggregate at least $10,000 of such claims;

11 U.S.C. § 303(b).

16. In determining whether a particular claim in subject to a bona fide dispute under section 303(b)(1), courts in this district generally evaluate whether "there is either a genuine issue of material fact that bears upon the debtor's liability, or a meritorious contention as to the application of law to undisputed facts." *Remex Electronics Ltd. v. Axl Indus., Inc. (In re Axl Indus., Inc.)*, 127 B.R. 482, 485 (S.D. Fla. 1991) (citing *In re General Trading, Inc.,* 87 B.R. 216 (Bankr. S.D. Fla.1988) (Weaver, J.)). "The test is whether there is any legitimate basis for the debtor not paying a debt, whether that basis is factual or legal." *Id.*

17. In this case, each of the 13 Petitioning Creditors holds an unsecured claim against Vicor that is not contingent as to liability or the subject of a bona fide dispute as to liability or amount under section 303(b)(1). Filed with the Court contemporaneously herewith and in support hereof are sworn declarations by each of the Petitioning Creditors attesting to the nature and amount of their claims, and attaching documentation to support their claims, as of the involuntary petition date.

18. The debt owed each of the Petitioning Creditors has been admitted to by Vicor in its accounts payables ledger as of January 31, 2012, a true and correct copy of which is attached hereto as **Exhibit A**. This ledger was obtained from petitioning creditor, T.J. Bohannon, Inc., Vicor's former CFO, and the veracity and accuracy of such ledger is attested to in the sworn declaration of Thomas J. Bohannon, president of T.J. Bohannon, Inc., filed with the Court.

19. For these reasons, there is no genuine issue as to any material fact that the Petitioning Creditors have to prove in respect of their threshold eligibility under section 303(b).

### III. Vicor is Generally Not Paying its Undisputed Debts as Such Debts Become Due Under 11 U.S.C. § 303(h)

20. Section 303(h) provides:

> (h) If the petition is not timely controverted, the court shall order relief against the debtor in an involuntary case under the chapter under which the petition was filed. Otherwise, after trial, the court shall order relief against the debtor in an involuntary case under the chapter under which the petition was filed, only if—
>
> (1) the debtor is generally not paying such debtor's debts as such debts become due unless such debts are the subject of a bona fide dispute as to liability or amount; or
>
> (2) within 120 days before the date of the filing of the petition, a custodian, other than a trustee, receiver, or agent appointed or authorized to take charge of less than substantially all of the property of the debtor for the purpose of enforcing a lien against such property, was appointed or took possession.

11 U.S.C. § 303(h).

21. Because Vicor has timely contested the involuntary petition under Federal Rule of Bankruptcy Procedure 1011(b), the Petitioning Creditors must prove, in addition to their threshold eligibility under section 303(b), that Vicor "is generally not paying" its undisputed debts as such debts become due under section 303(h)(1) as a condition to the Court's entry of an order for relief in this case.

22. To determine whether an alleged debtor is "generally not paying" its undisputed debts as they come due under section 303(h)(1), courts in this district apply a "totality of the circumstances" test which "focuses on the debtor's financial condition by looking at several different factors, including the number of unpaid claims, the amount of the claims, the materiality of nonpayment, and the overall conduct of the debtor's financial affairs." *Federal Fin. Co. v. DeKaron Corp.*, 261 B.R. 61, 65 (S.D. Fla. 2001) (citing *In re Smith,* 243 B.R. 169, 190 (Bankr. N.D. Ga. 1999). In this context, courts examine the matured and unpaid debt in relation to the alleged debtor's assets and other liabilities. *See In re Paper I Partners, L.P.*, 283 B.R. 661 (Bankr. S.D.N.Y. 2002).

7

23. In its Form 10-Q filed with the SEC on December 8, 2011, a true and correct copy of which is attached hereto as **Exhibit B**,[2] Vicor admits its "inability to pay liabilities as they became due" and that approximately $8.3 million in principal amount of notes were in default. *See* Ex. B, pp. 16-20, 36-37. Vicor's accounts payable ledger shows an additional amount of approximately $1.9 million owed to other creditors including the Petitioning Creditors. *See* Ex. A. According to its Form 10-Q, as of September 30, 2011, Vicor had just $3,000 in available cash. *See* Ex., B., pp. 4, 31.

24. Vicor even admitted in its Form 10-Q that it was not paying its debts as they came due because it had insufficient cash, and acknowledged the very real possibility of being placed into an involuntary bankruptcy by its undisputed creditors:

- "The Company is in substantial arrears with its accounts payable, and no management salaries have been paid in the three months ended September 30, 2011." Ex. B, p. 13.

- "The Company is in technical default on both the 8% Subordinated Convertible Notes and the 10% Convertible Promissory Notes because of its inability to pay liabilities as they became due during the three months ended September 30, 2011." *Id.*, p. 16.

- "Additionally, the 15% Promissory Notes aggregating $350,000 are also in default. $250,000 of these notes was due to be repaid on November 11, 2011, but this did not occur. The remaining 15% Promissory Note of $100,000 is also in default as a result of nonpayment of the November interest." *Id.*, p. 18.

- "Since June 2011 the Company has not made interest payments on substantially all the 2004 Notes or the 12% Convertible Promissory Notes. The Company is in technical default on the debt." *Id.*, p. 37.

- "The Company has been operating since June 2011 with extremely limited available cash…. The Company desperately needs additional sources of financing. If such financing is not obtained, the Company may have to curtail its operations in December 2011 or be placed in involuntary bankruptcy by its creditors." *Id.*, p. 31.

---

[2] The Court can take judicial notice of Vicor's Form 10Q, a public record filed with the U.S. Securities Exchange Commission, pursuant to Federal Rule of Evidence 201(b)(2), and the Petitioning Creditors respectfully request that the Court take judicial notice of the Form 10Q pursuant to Federal Rule of Evidence 201(c)(2). Petitioning creditor, David H. Fater, Vicor's former CEO and a signatory of the Form 10Q, has certified in his sworn declaration that the copy attached hereto as Exhibit B is a true and correct copy of the original pursuant to Federal Rule of Evidence 1005. The Form 10Q also qualifies as a prior admission by Vicor excluded from hearsay by Federal Rule of Evidence 801(d).

- "The Company is in substantial arrears with its accounts payable and no management salaries have been paid for the three months ended September 30, 2011. The Company needs to continue to incur expenditures to further the commercial development of its products. These matters raise substantial doubt about the Company's ability to continue as a going concern." *Id.*, p. 31.

- "At September 30, 2011, we had a working capital deficiency of $11,594,000 and $3,000 in cash. Based on our cash balance as of November 11, 2011, management believes that we do not have sufficient funds to continue current operations through the end of December 2011." *Id.*, p. 31.

- "At September 30, 2011, the Company had a working capital deficiency of $11,594,000, an accumulated deficit of $66,194,000 and a net capital deficiency of $12,890,000. The Company is in substantial arrears with its accounts payable, and no management salaries have been paid in the three months ended September 30, 2011. The lack of working capital has severely restricted the Company's ability to implement its sales strategies. The Company needs to continue to incur expenditures to further the commercial development of its products. These matters raise substantial doubt about the Company's ability to continue as a going concern." *Id.*, p. 33.

- "If the Company is not able to timely and successfully raise additional capital and/or achieve positive cash flow, its business, financial condition, cash flows and results of operations will be materially and adversely affected, and the Company may have to curtail its operations in December 2011 or be placed in involuntary bankruptcy by its creditors." *Id.*, p. 33.

The Form 10-Q was signed, and the truth and accuracy of the statements contained therein were certified, by James E. Skinner, Vicor's current interim CEO. *See* Ex. B, p. 37, Ex. 31.3 (p. 43).

25. Vicor's statements in its Form 10-Q are further supported by its accounts payable ledger attached hereto as Exhibit A, which show more than $1.9 million in past-due vendor and employee liabilities (not including the $8.3 million in defaulted notes) as of January 31, 2012, most of which were more than 90 days past due as reflected by the aging report attached to the ledger. *See* Ex. A.

26. Additionally, Vicor's interim CEO, James E. Skinner, has sent correspondence to one or more of the Petitioning Creditors over the past year reiterating what is plainly reflected by the

Form 10-Q – that Vicor is generating no revenue, has no cash to pay its debts and likely would need to file chapter 7 bankruptcy. Skinner even stated in an e-mail to petitioner David H. Fater, dated July 2, 2012, that Vicor needed to file a voluntary chapter 7 bankruptcy but did not even have the few thousand dollars necessary to retain counsel. True and correct copies of the referenced e-mails by Skinner are attached hereto as composite **Exhibit C**, and the veracity and accuracy thereof have been attested to in the sworn declaration of David H. Fater filed with the Court.

27.     Skinner also informed a group of Vicor shareholders in an e-mail dated November 19, 2012 (just two weeks before the involuntary petition date), that unpaid vendors owed a total of $560,000 were demanding payment, the convertible notes were still unpaid, the unpaid compensation claims owed to petitioner David H. Fater (Vicor's former CEO) and other members of the former management team totaled $1.5 million, and that $140,000 was owed to Skinner personally. A true and correct copy of Skinner's November 19, 2012 e-mail is attached hereto as **Exhibit D**.

28.     As further evidence of Vicor's continuing failure to pay undisputed debts as they come due, another creditor, Gary Schwartz, obtained a judgment against Vicor in the principal amount of $358,768.33 less than 30 days ago, on December 17, 2012, in a state court lawsuit which, upon information and belief, Vicor did not even defend. A true and correct copy of the Schwartz judgment against Vicor is attached hereto as **Exhibit E**.

29.     Based on its plain admissions and other evidence in the referenced documents attached hereto that Vicor has not paid its debts as they come due, the Petitioning Creditors believe there is no genuine issue as to any material fact they have to prove under section 303(h) and that the burden should now be shifted Vicor to demonstrate that it is generally paying its undisputed debts as they come due, by way of competent evidence under Federal Rule of Civil Procedure 56(c), incorporated herein by Federal Rules of Bankruptcy Procedure 1018 and 7056, to avoid summary

judgment and entry of an order for relief.

## CONCLUSION

30.　For all the foregoing reasons, the Court should grant summary judgment in favor of the Petitioning Creditors, pursuant to Federal Rules of Bankruptcy Procedure 1018 and 7056, on their involuntary petition and enter an order for relief against Vicor under 11 U.S.C. § 303(b) and (h). In the event that the Court determines that complete summary judgment as requested herein is inappropriate due to the existence of one or more genuine issues of material fact, the Petitioning Creditors request that the Court grant partial summary judgment, pursuant to Federal Rule of Civil Procedure 56(d)(1) (incorporated in Fed. R. Bankr. P. 7056), specifying those facts that are not genuinely at issue and are established in this proceeding.

WHEREFORE, the Petitioning Creditors respectfully request that the Court grant summary judgment in favor of the Petitioning Creditors on their involuntary petition and enter an order for relief against Vicor under 11 U.S.C. § 303(b) and (h), and grant such other and further relief as the Court deems just and proper.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing motion was filed electronically and served by Notice of Electronic Filing upon each of the parties and counsel identified on the CM/ECF service list maintained by the Court for this case, on January 14, 2013.

　　　　　　　　　　　　　　　　　　　Respectfully submitted,

　　　　　　　　　　　　　　　　　　　MANCUSO LAW, P.A.
　　　　　　　　　　　　　　　　　　　*Counsel for Petitioning Creditors*
　　　　　　　　　　　　　　　　　　　Boca Raton Corporate Centre
　　　　　　　　　　　　　　　　　　　7777 Glades Rd., Suite 100
　　　　　　　　　　　　　　　　　　　Boca Raton, Florida 33434
　　　　　　　　　　　　　　　　　　　Tel: 561-245-4705
　　　　　　　　　　　　　　　　　　　Fax: 561-245-4639
　　　　　　　　　　　　　　　　　　　E-mail: ngm@mancuso-law.com

　　　　　　　　　　　　　　　　By: */s/ Nathan G. Mancuso*　　　　
　　　　　　　　　　　　　　　　　　　Nathan G. Mancuso, Esq.
　　　　　　　　　　　　　　　　　　　Florida Bar No. 174254